317 Ga. 115
FINAL COPY

S23A0601.  LOCKLEAR v. THE STATE.

BETHEL, Justice.

A jury found Tony James Locklear guilty of the malice murder of William Long, concealing a death, and related charges.[1] On appeal, Locklear challenges the sufficiency of the evidence supporting his convictions. He also argues that the trial court erred by (1) failing to suppress statements made during his custodial interview; (2) denying his motion to suppress certain physical evidence; (3) providing a confusing verdict form to the jury; and

---

[1] On January 9, 2019, a Chatham County grand jury indicted Locklear for malice murder, felony murder, aggravated assault, and concealing the death of another. Locklear was tried before a jury from November 18 to 21, 2019, and he was found guilty of all counts. The trial court sentenced Locklear as a recidivist under OCGA § 17-10-7 (a) and (c) to serve life in prison for malice murder and a consecutive term of ten years for concealing the death of another. The felony murder count was vacated by operation of law, and the aggravated assault count merged into the malice murder conviction. Locklear filed a timely motion for new trial on November 26, 2019, which he amended through new counsel on January 7, 2022, and August 15, 2022. Following a hearing, the trial court denied Locklear's motion for new trial as amended. Locklear filed a timely notice of appeal, and his appeal was docketed in this Court to the April 2023 term and submitted for a decision on the briefs.

(4) refusing to grant a mistrial after the prosecutor made improper comments during closing arguments. Because the evidence was clearly sufficient to support Locklear's convictions and because the trial court committed no reversible error with respect to Locklear's other enumerations of error, we affirm.

1. Locklear first asserts that the evidence was insufficient to support his convictions. When considering the sufficiency of evidence, we ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." (Emphasis omitted.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

Viewed in this light, the evidence at trial showed as follows. On the morning of October 13, 2018, 82-year-old William Long left his home for work but did not return that evening and did not answer his phone when family and friends tried to contact him. The next day, with Long still missing, his son, Robert Long, accessed his father's phone records, which showed that Long's last call was made

at 8:51 a.m. on October 13. Robert began calling the most recent phone numbers that his father had called, and he reached Locklear, who stated that he had worked for and been fired by Long on four occasions but had contacted Long recently to inquire about more work. Locklear indicated that Long had agreed to hire him and was supposed to pick him up the previous morning but never arrived.

In the meantime, Floyd Williams, Long's friend, decided to look for Long at job sites where Long had recently worked. Williams, accompanied by his grandson, soon located Long's truck with Locklear asleep inside. While Williams' grandson was peeking in the truck's window, Locklear awoke and drove off, nearly hitting Williams' grandson in the process. Williams and his grandson gave chase, followed the truck for about ten minutes, lost it briefly, and then found it abandoned in a residential area with its door open and the key still in the ignition. Williams contacted police during the pursuit, and responding officers found Locklear about ten feet from the truck hiding behind a tree and holding a small knife to his own neck. After being detained, Locklear told officers that he intended to

"end it all" and expected to spend the rest of his life in prison. The officers then transported Locklear to the police station.

During a custodial interview, Locklear, who was homeless and had been camping in a wooded area, described the events leading to Long's death and told police where to find Long's body. According to Locklear, he "ha[s] blackouts sometimes," and, although he could not remember anything about the incident when he first awoke on the morning of October 14, his memories had started to return. Locklear claimed that Long "put his hands on [Locklear] and pulled [Locklear's] pants down," which, he said, caused him to blackout. Locklear reported discovering Long's body near his campsite. Police later learned that Locklear left a voicemail for his son and daughter-in-law the morning of October 14, explaining that he "need[ed] [them] bad" and had "f**ked up."

Officers located Long's body in a wooded area about 50 yards from Locklear's tent. The body had been rolled in a plastic tarp, placed in a sleeping bag, and wrapped in trash bags with twine tied around the head and feet; debris had been heaped on the body. Police

4

obtained a warrant to search Locklear's tent and, inside, found the same twine used to bind Long's body, as well as a knife that appeared blood-stained and on which Long's DNA was later identified. The autopsy revealed that Long had suffered 21 sharp and blunt force injuries — mostly to his head and neck — the totality of which resulted in his death. It appeared from the autopsy that one wound was inflicted by a screwdriver, and police located a screwdriver during a subsequent search of Locklear's tent.

Locklear's theory of defense at trial was that he acted in self-defense after Long attempted to commit a forcible felony — aggravated oral sodomy — against him. Locklear did not testify or offer any evidence in support of his defense and instead relied solely on his statements made during the custodial interview. The evidence recounted above was plainly sufficient to sustain Locklear's convictions as a matter of constitutional due process. See *Jackson*, 443 U. S. at 319 (III) (B). Locklear's arguments to the contrary are unavailing.

Locklear first argues that the evidence was insufficient to

support his conviction for malice murder because, he says, the State did not produce any evidence to contradict his claim of self-defense. He also contends that, even if his actions did not rise to the level of self-defense, the evidence showed that he acted in a heat of passion and that he should have been found guilty of voluntary manslaughter, rather than malice murder. "But questions about the existence of justification are for a jury to decide," *Corley v. State*, 308 Ga. 321, 322 (1) (a) (840 SE2d 391) (2020), as are questions about the sufficiency of provocation to support a verdict of voluntary manslaughter, see *McNair v. State*, 296 Ga. 181, 182 (1) (766 SE2d 45) (2014). And contrary to Locklear's contention, the State presented significant evidence contradicting his self-serving version of events, including evidence showing that Locklear used both a knife and a screwdriver to stab the 82-year-old Long 21 times and subsequently took extensive measures to conceal Long's body. See *Martin v. State*, 306 Ga. 538, 541 (1) (832 SE2d 402) (2019) (evidence that appellant "took extreme measures to destroy and conceal evidence" undermined his claim of self-defense); *Ferguson v. State*,

297 Ga. 342, 344 (1) (773 SE2d 749) (2015) (jury was authorized to reject appellant's unrebutted testimony that he acted in self-defense, especially in light of "evidence that appear[ed] at odds with [appellant's] account, as, for example, the sheer number of stab wounds sustained by [the victim], which is indicative of an aggressive attack rather than defensive maneuverings").

Turning to the conviction for concealing a death, Locklear argues that, because he told police where to find Long's body, he did not hinder discovery of Long's murder.[2] But the evidence showed that Locklear went to great lengths to conceal Long's death: Long's body was found in a wooded area, about 50 feet from the wood line, wrapped in a sleeping bag and plastic tarp, tied with twine, and covered with trash, and investigating officers found blood spatter on trees about 15 yards from where Long's body was located, indicating that the body was moved. In addition, when contacted by Long's son, Locklear prevaricated, indicating that he had not seen Long, despite

[2] "A person who, by concealing the death of any other person, hinders a discovery of whether or not such person was unlawfully killed is guilty of a felony[.]" OCGA § 16-10-31.

7

knowing both where Long was and that he was dead. That Locklear eventually told police where to find Long's body does not negate the fact that Locklear concealed Long's death when he "hindered discovery" of the facts that Long "was dead and was the victim of an unlawful homicide." *White v. State*, 287 Ga. 713, 716-717 (1) (c) (699 SE2d 291) (2010) (sufficient evidence supported conviction for concealing death of another where appellant removed victim's body from site where she was killed and falsely told victim's children and police that victim was missing when he knew she was dead). The evidence at trial was more than sufficient to support Locklear's convictions for malice murder and concealing the death of another.

2. Locklear next asserts that the trial court erred by failing to suppress incriminating statements made during his custodial interview at the police station, which he says were made after he invoked his right to remain silent under the Fifth Amendment to the United States Constitution. To establish that he invoked his right to remain silent, Locklear points to body-camera footage taken at the location where he was detained that shows an officer asking

8

Locklear, who was handcuffed in the back seat of a police car, how he obtained Long's truck and Locklear responding, "Bill c[a]me by yesterday, okay, that's as far as I'm going with it." This claim fails.

The record shows that Locklear filed a pre-trial motion to suppress statements he made after first being detained by police and later during the custodial interview at the police station on the grounds that police questioned him without giving him the warnings required by *Miranda*[3] and that he invoked his right to remain silent but was ignored. Following a *Jackson-Denno*[4] hearing, the trial court granted Locklear's motion and suppressed his statements made at the scene after Locklear was asked how he came into possession of Long's truck, finding that officers questioned Locklear without first advising him of the *Miranda* warnings. But the trial court denied the motion as to statements made during the custodial interview at the police station, finding that Locklear was advised of the *Miranda* warnings prior to the interview and that he understood his rights,

---

[3] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).
[4] *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

9

voluntarily waived them, and gave his statements freely and voluntarily.

Though Locklear's motion expressly asserted a second basis for suppression — that the officers failed to honor his invocation of his right to remain silent, the same argument he raises on appeal — the trial court made no ruling on that issue. It does not appear from the record that Locklear moved for reconsideration or otherwise brought to the trial court's attention its failure to rule on the issue of whether he invoked his right to remain silent, nor did Locklear renew his objection to the admission of this evidence at trial. Accordingly, we review this claim only for plain error. See *Goins v. State*, 310 Ga. 199, 204 (4) (850 SE2d 68) (2020) (applying plain-error review where appellant moved to suppress evidence on certain grounds but trial court did not rule on the motion and appellant did not request a ruling or object when the evidence was admitted at trial); *Lofton v. State*, 309 Ga. 349, 358 (4) (846 SE2d 57) (2020) (same); OCGA § 24-1-103 (d).

To prevail on this claim, [Locklear] must demonstrate

that the trial court committed an error that was not affirmatively waived, was obvious beyond reasonable dispute, likely affected the outcome of his trial, and seriously affected the fairness, integrity, or public reputation of judicial proceedings.

*Goins*, 310 Ga. at 204 (4). "And if an appellant fails to establish any one of these elements, his plain error claim fails." *Wright v. State*, 315 Ga. 459, 462 (3) (883 SE2d 294) (2023).

We have explained that "[p]olice must scrupulously honor a suspect's right to remain silent if the person clearly and unambiguously states that he wants to end a custodial interrogation." (Citation and punctuation omitted.) *Causey v. State*, 307 Ga. 147, 148-149 (2) (834 SE2d 857) (2019). "Whether an invocation is unambiguous and unequivocal depends on whether the accused articulated a desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." (Citation and punctuation omitted.) *Sillah v. State*, 315 Ga. 741, 748 (2) (883 SE2d 756) (2023). "[I]f a defendant equivocates in asserting the right, a police officer is under no obligation to clarify

11

or to stop questioning." (Citation and punctuation omitted.) *Causey*, 307 Ga. at 149 (2).

To support his claim that he invoked his right to remain silent, Locklear relies on his statement made at the scene in response to the officer's question about how he obtained Long's truck, "Bill c[a]me by yesterday, okay, that's as far as I'm going with it"; he also points to his refusal to answer some of the officer's subsequent questions as evidence of invocation. But neither that statement nor Locklear's subsequent silence was "an invocation of his right to remain silent, let alone an 'unequivocal and unambiguous' one." *Dozier v. State*, 306 Ga. 29, 34 (4) (a) (829 SE2d 131) (2019). A reasonable law enforcement officer instead would have understood Locklear's statement to mean only that he did not want to discuss in greater detail what happened in relation to Long's truck, not that he did not want to speak to police at all.[5] See *Cheley v. State*, 299 Ga.

---

[5] To that end, about a minute after Locklear made the statement, the officer asked, "You don't want to tell us about what happened after [Long] came by and picked you up?" and Locklear responded by shaking his head in the negative.

12

88, 91 (2) (786 SE2d 642) (2016) (considered in context, a reasonable officer would have understood appellant's statement that he was "completely finished" to mean "only that [appellant] had lost patience with the repeated and continued questions about what he had done *before* buying gasoline and that he wanted to know what the investigators were investigating" (emphasis in original)); *Barnes v. State*, 287 Ga. 423, 425 (2) (696 SE2d 629) (2010) (appellant's statement "'if you're not going to talk real talk, then we shouldn't talk' was not an unequivocal and unambiguous invocation of his right to remain silent" because "it was conditional and ambiguous, and lacked sufficient clarity to lead a reasonable police officer to understand that [appellant] was exercising his right to remain silent"). Locklear's contention that he invoked his right to remain silent by not answering the officer's subsequent questions is likewise unavailing because his refusal to respond does not amount to an "unambiguous and unequivocal invocation." See *Berghuis v. Thompkins*, 560 U. S. 370, 381 (III) (A) (130 SCt 2250, 176 LE2d 1098) (2010) (rejecting argument that defendant invoked the right

13

to remain silent "by not saying anything for a sufficient period of time").

Because Locklear did not unambiguously and unequivocally invoke his right to remain silent, the officers at the scene and, later, at the police station, had no obligation to stop questioning him. Accordingly, the trial court did not commit clear error by admitting Locklear's subsequent statements made during the custodial interview, and Locklear has failed to establish plain error.

3. Locklear also challenges the trial court's denial of his motion to suppress evidence obtained during the search of his tent, arguing that the search warrant was premised on his custodial statement which, he asserts, was obtained in violation of his right to remain silent. In light of our holding in Division 2, this claim fails.

4. In his fourth enumeration of error, Locklear contends that the trial court erred by providing what he says was a confusing and incomplete pre-printed verdict form to the jury. As Locklear concedes, he failed to object to the verdict form at trial, so we review this claim only for plain error. See OCGA § 17-8-58 (b).

"In deciding whether a verdict form accurately presented the law and properly guided the jury, this Court reviews the language of the form along with the trial court's instructions to the jury." *Atkins v. State*, 310 Ga. 246, 252 (3) (850 SE2d 103) (2020).

> [A] verdict form is erroneous when the form would mislead jurors of reasonable understanding, or the trial court erroneously instructed the jury on the presumption of innocence, the State's burden of proof, the possible verdicts that could be returned, or how the verdict should be entered on the printed form. A preprinted verdict form is treated as part of the jury instructions which are read and considered as a whole in determining whether there is [instructional] error.

(Citation and punctuation omitted.) Id.

The challenged language of the pre-printed verdict form read as follows:

> As to the homicide, we the jury, find sufficient mitigating evidence of passion or provocation beyond a reasonable doubt which causes the offense to be reduced to the offense of Voluntary Manslaughter;
> OR
> As to the homicide, we do not find sufficient mitigating evidence of passion or provocation beyond a reasonable doubt which causes the offense to be reduce[d] to the offense of Voluntary Manslaughter.

Locklear argues that the verdict form was deficient because, as he

15

reads it, the form improperly required the jury, in order to find him

not guilty of the lesser offense of voluntary manslaughter, to find

him not guilty beyond a reasonable doubt.[6] We agree that, standing

alone, this part of the verdict form — specifically, the unnecessary

insertion of the "beyond a reasonable doubt" standard with respect

to the presence of mitigating circumstances — is inartful and

potentially confusing.[7] But it is axiomatic that we do not assess jury

charges in isolation; rather, we "consider them as a whole to

---

[6] Locklear also complains that the verdict form was erroneous because it required the jury to consider the lesser offense of voluntary manslaughter before considering the remaining offenses. But our precedent makes clear that this instruction, in fact, was proper, and, thus, this argument is without merit. See, e.g., *White v. State*, 291 Ga. 7, 9 (3) (727 SE2d 109) (2012) ("[T]he trial court . . . properly instructed the jury that it had to consider whether mitigating circumstances reduced the killing to voluntary manslaughter before it was authorized to return a guilty verdict on the malice murder or felony murder charge."); *Terry v. State*, 291 Ga. 508, 509 (2) (a) (731 SE2d 669) (2012) (same); *Miner v. State*, 268 Ga. 67, 68 (4) (485 SE2d 456) (1997) (same).

[7] The State bears the burden of proving beyond a reasonable doubt that an offense *was not* mitigated by passion or provocation. See *Morris v. State*, 303 Ga. 192, 200 (V) (C) (811 SE2d 321) (2018). But the determination of whether an offense *was* mitigated by passion or provocation turns not on whether the evidence shows beyond a reasonable doubt that the offense was so mitigated but rather whether the evidence shows that the offense resulted from provocation "sufficient to excite [a sudden, violent, and irresistible] passion in a reasonable person." OCGA § 16-5-2 (a). Thus, the jury is tasked with determining whether the evidence of passion or provocation was sufficient to create a reasonable doubt with respect to guilt.

determine whether there is a reasonable likelihood the jury improperly applied a challenged instruction." (Citation and punctuation omitted.) *Johnson v. State*, 312 Ga. 481, 490 (3) (863 SE2d 137) (2021). And in light of the charges as a whole, Locklear has not shown that the inartful nature of the verdict form likely affected the outcome of the proceedings.

As an initial matter, the remainder of the pre-printed verdict form correctly stated the burden of proof with respect to each charged offense.[8] The record also shows that the trial court properly instructed the jury on the charged offenses, the lesser offense of voluntary manslaughter, the State's burden of proof, the possible verdicts that could be returned, and how to enter the verdicts on the printed form. In addition, the trial court instructed the jurors three separate times that they were required to consider whether mitigating circumstances caused the offense of murder to be reduced

---

[8] For each of the four charged offenses, the verdict form required the jury to select between two options: "We, the jury, find beyond a reasonable doubt the Defendant, Tony Locklear is GUILTY of [the charged offense]" or "We, the jury, find the Defendant, Tony Locklear, NOT GUILTY of [the charged offense]."

17

to voluntary manslaughter and that the State bore the burden of proving beyond a reasonable doubt that the offense was not mitigated.[9] The trial court twice asked whether the jurors understood that instruction, and the jurors responded affirmatively both times. The trial court also cautioned the jurors that, if they found that Long's killing occurred as a result of passion or provocation, they could not return a guilty verdict on the malice murder or felony murder counts. And the trial court provided several copies of the written instructions for the jury to reference during deliberations. See *Howard v. State*, 288 Ga. 741, 745 (3) (707 SE2d 80) (2011) ("[T]he presence of the written instructions in the jury room would have served to enlighten, rather than confuse, the jury."). Accordingly, Locklear has not shown that the verdict form affected the outcome at trial and, thus, has not demonstrated plain error.

---

[9] The trial court gave no indication during its verbal instructions that the beyond-a-reasonable-doubt standard applied to the jury's consideration of the existence of mitigating circumstances and instead properly limited the application of that standard to the State's burden of proving the absence of mitigation.

18

5. Finally, Locklear asserts that the trial court abused its discretion by denying his motion for mistrial following the prosecutor's improper comments during closing arguments. The record shows that, as part of her final summation, the prosecutor commented, "I know [Locklear's] in a wheelchair now. Not really sure why, other than to weigh on your sympathies." Locklear objected to this argument as improper, which the trial court sustained. Near the end of her closing argument, the prosecutor characterized the jury's role as "speak[ing] for the community" and insisted that, if the jury found Locklear guilty only of voluntary manslaughter, "[i]t's open season for murder." Locklear again objected, and the trial court again sustained his objection. After the prosecutor had finished her argument and the jury had been excused from the courtroom, Locklear moved for a mistrial or, alternatively, a curative instruction. The trial court denied the motion for mistrial and determined that a curative instruction was not warranted, reasoning that the general jury instructions sufficed to remedy the prosecutor's comments. Pretermitting whether Locklear timely

19

moved for a mistrial, we see no abuse of discretion in the trial court's denial of the mistrial.

A trial court has broad discretion in ruling on a motion for mistrial, "and the denial of a mistrial is reversible error only if it appears that a mistrial was essential to preserve the defendant's right to a fair trial." (Citation and punctuation omitted.) *McKibbins v. State*, 293 Ga. 843, 848 (3) (750 SE2d 314) (2013). While the prosecutor's comments here were indeed improper, Locklear cannot establish that a mistrial was essential to preserve his right to a fair trial.

The record shows that the prosecutor's comments were fleeting, and the trial court sustained Locklear's objections in the presence of the jury. Moreover, as part of its general charge to the jury, the trial court defined evidence, instructed that closing arguments are not evidence, and explained that only testimony and other evidence presented during the evidentiary portion of the trial could be considered in reaching a verdict. The trial court also instructed the jury that it was duty-bound "to consider the facts

20

objectively without favor, affection, or sympathy to any party" and was "not permitted to be governed by sympathy or prejudice or because of public opinion." "We presume that jurors follow the law." (Citation and punctuation omitted.) *Kessler v. State*, 311 Ga. 607, 614 (3) (858 SE2d 1) (2021). Under these circumstances, any harm that flowed from the prosecutor's improper comments did not affect Locklear's right to a fair trial, and we cannot say that the trial court abused its broad discretion when it denied a mistrial. See id.; *Fulcher v. State*, 297 Ga. 733, 736 (3) (778 SE2d 159) (2015). See also *Reed v. State*, 291 Ga. 10, 17 (4) (b) (727 SE2d 112) (2012) ("[E]ven when an objection to improper argument is sustained but a mistrial is denied, other action, including the giving of curative instructions, is not mandatory." (citation and punctuation omitted)).

*Judgment affirmed. All the Justices concur.*

Decided August 21, 2023.

Murder. Chatham Superior Court. Before Judge Morse.

*David T. Lock*, for appellant.

*Shalena C. Jones, District Attorney, Brian W. DeBlasiis, Jillian H. Gibson, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.