317 Ga. 414
FINAL COPY

S23A0547. KINLAW v. THE STATE.

BETHEL, Justice.

A Glynn County jury found Harold Dean Kinlaw guilty of the malice murder of Felipe Herrera, the aggravated stalking and kidnapping of Kinlaw's former wife Damaris Kinlaw, and other related crimes.[1] Kinlaw appeals, arguing that the evidence was

---

[1] The crimes occurred on January 18, 2004. On May 19, 2004, a Glynn County grand jury indicted Kinlaw and Jamie Teresa Morris for malice murder of Herrera (Count 1), felony murder of Herrera (Count 2), and kidnapping of Damaris (Count 3). Kinlaw was separately indicted for the aggravated assault of Damaris (Count 4), aggravated stalking (Count 5), possession of a firearm during the commission of a crime (Counts 6 and 7), and possession of a firearm by a convicted felon (Count 8). The State subsequently filed notice of its intent to seek the death penalty against Kinlaw. Morris pleaded guilty to conspiracy to commit kidnapping and testified against Kinlaw at trial.

At the guilt-innocence phase of Kinlaw's trial, which was conducted from November 7 to November 18, 2008, the jury found Kinlaw guilty of Counts 1 and 3 through 8. The sentencing phase was conducted from November 18 to November 22, 2008; the jury found the existence of two statutory aggravating circumstances and fixed a sentence of life without parole for malice murder. The trial court sentenced Kinlaw to serve life in prison without parole on Count 1, twenty years in prison each on Counts 3 and 4, ten years in prison on Count 5, five years in prison each on Counts 6 and 7, and five years in prison on Count 8, with Counts 3 through 8 to be served consecutively to Count 1 and to each other. Count 2 was nolle prossed.

On December 10, 2008, Kinlaw's trial counsel timely filed a boilerplate

insufficient to support his conviction for aggravated stalking and that the trial court erred by refusing to provide an interpreter for a witness at trial, by excluding evidence that Herrera had threatened Kinlaw, by failing to charge the jury on voluntary manslaughter and self-defense, and by employing an improper remedy after finding that the State had violated *Batson v. Kentucky*, 476 U. S. 79 (106 SCt 1712, 90 LE2d 69) (1986). For the reasons explained below, we affirm.

---

motion for new trial. On December 11, 2008, Kinlaw filed a pro se motion for appointment of appellate counsel. New attorneys filed entries of appearance in November 2009 and May 2014, but it does not appear from the record that those attorneys took any action on Kinlaw's appeal. In November 2019, current appellate counsel, the third post-trial counsel to enter an appearance in this case, was appointed by the Georgia Public Defender Council to represent Kinlaw. Current appellate counsel filed amended motions for new trial on October 23, 2020, and February 17, 2021. Following a hearing, the trial court denied Kinlaw's motion for new trial, as amended. Kinlaw filed a timely notice of appeal, and his appeal was docketed in this Court to the April 2023 term and submitted for a decision on the briefs.

We are troubled by the inordinate and unexplained delay between the filing of Kinlaw's motion for new trial in December 2008 and the filing of an amended motion for new trial nearly 12 years later. So, yet again, we remind the bench and bar that long post-conviction delays "put at risk the rights of defendants and crime victims and the validity of convictions obtained after a full trial," and we "reiterate that it is the duty of all those involved in the criminal justice system . . . to ensure that the appropriate post-conviction motions are filed, litigated, and decided without unnecessary delay." (Citation and punctuation omitted.) *Owens v. State*, 303 Ga. 254, 258 (4) (811 SE2d 420) (2018).

2

1. The evidence at trial showed as follows. On January 18, 2004, Kinlaw shot and killed Herrera, who was engaged in a romantic relationship with Damaris. Kinlaw and Damaris were divorced in December 2003; the final judgment and decree of divorce incorporated a permanent restraining order, which prohibited Kinlaw from contacting Damaris.[2] On the morning of the crimes, co-indictee Jamie Morris, who was Kinlaw's girlfriend, dropped off Kinlaw near Damaris's home. Armed with a handgun, Kinlaw hid in Damaris's carport underneath a cloth-covered picnic table. Herrera arrived later, and he and Damaris sat in the carport drinking coffee, unaware that Kinlaw was hiding nearby.

Eventually, a gust of wind disturbed the tablecloth and revealed Kinlaw, who emerged from beneath the table with his gun pointed at Damaris and Herrera. Damaris jumped in front of Herrera, screaming, "Please don't, Harold, please don't." Herrera moved toward Kinlaw, reaching for the arm with which Kinlaw was

---

[2] The final judgment converted a previously entered temporary restraining order to a permanent restraining order and indicated that Kinlaw was "bound by that [o]rder on penalty of felony aggravated stalking."

3

holding the gun. Kinlaw fired the gun three times, striking and killing Herrera. Kinlaw then forced Damaris into her truck, drove to a nearby parking lot where Morris was waiting, and transferred Damaris to Morris's vehicle. Morris drove the trio to a hotel in North Carolina where Kinlaw was arrested two days later.

2. Kinlaw challenges the sufficiency of the evidence supporting his conviction for aggravated stalking, which was predicated on his violation of the permanent restraining order incorporated into the divorce decree. When we evaluate the sufficiency of the evidence to sustain a conviction,

> we view the evidence in the light most favorable to the verdict, draw every reasonable inference from the evidence that is favorable to the verdict, ignore any conflicts or inconsistencies in the evidence, [and] assume that the jury reasonably believed every word of testimony favorable to the verdict and reasonably disbelieved every word unfavorable to it.

(Citation and punctuation omitted.) *State v. Thomas*, 311 Ga. 407, 420 (4) (858 SE2d 52) (2021).

Kinlaw first asserts that, because the judge presiding over his divorce action orally indicated prior to the entry of the final divorce

decree that he would dismiss the case,[3] the underlying protective order was void and could not support the aggravated stalking conviction. But the divorce action, in fact, was not dismissed because the judge's "oral pronouncement" was not reduced to writing and, so, was of no legal effect. See *Williams v. Williams*, 295 Ga. 113, 114 (1) (757 SE2d 859) (2014) ("[A]n oral pronouncement by a trial court during a hearing is not a judgment until it is reduced to writing and entered as a judgment."); *Tyree v. Jackson*, 226 Ga. 690, 694 (2) (177 SE2d 160) (1970) ("[W]hat the judge orally declares is no judgment until the same has been reduced to writing and entered as such."). And, in fact, the case proceeded to the entry of the final divorce decree, which incorporated the permanent restraining order. Accordingly, this argument fails.

Next, pointing to a notation in the written divorce decree that

---

[3] At a hearing held after Damaris obtained a temporary restraining order against Kinlaw in connection with her petition for divorce, Kinlaw's counsel represented that the parties had engaged in sexual relations after the divorce was initiated. On that basis, the judge orally indicated that he would dismiss the divorce case, but a written order memorializing the oral dismissal was not entered.

he did not appear for the final hearing, Kinlaw asserts that the State failed to prove an element of aggravated stalking because, he says, there was no evidence that he knew he was subject to a permanent restraining order. In that regard, this Court has held that, to prove the crime of aggravated stalking,[4] the State must show only that the defendant was "aware that a court order was in effect that prohibited" contact with the victim. *State v. Carlisle*, 280 Ga. 770, 772 (2) (631 SE2d 347) (2006).

Viewed in the light most favorable to the verdict, the evidence shows that, despite his absence from the final hearing, Kinlaw was aware of the divorce decree and its contents. Damaris testified that on January 1, 2004 — several weeks after the entry of the divorce decree but before the crimes at issue here — Kinlaw kidnapped her at knifepoint, held her for about a week, then released her. According to Damaris, Kinlaw knew that his business had been

---

[4] See OCGA § 16-5-91 (a) ("A person commits the offense of aggravated stalking when such person, in violation of a . . . permanent restraining order . . . follows, places under surveillance, or contacts another person at or about a place or places without the consent of the other person for the purpose of harassing and intimidating the other person.").

awarded to Damaris in the divorce decree and that she was in the process of selling it, and he let her go because "he wanted money" from the sale. An investigating officer testified that, after being arrested, Kinlaw acknowledged that he and Damaris were divorced and claimed that, on the day of the crimes, he went to see Damaris about money obtained from the sale of his business. These facts tended to show that Kinlaw knew at least some specific provisions of the divorce decree, making it less likely that he did not know about the included restraining order. And Morris, Kinlaw's co-indictee, testified that, days before the crimes, Kinlaw attempted to visit Damaris at home under cover of night while dressed all in black but was "spooked because of a dog barking and seeing a cop car and the lights come on at that house." From this evidence, the jury could reasonably infer that Kinlaw was aware of the contents of the divorce decree, including the permanent restraining order, and therefore knew that he was prohibited by court order from contacting Damaris. See *Worthen v. State*, 304 Ga. 862, 868 (3) (c) n.3 (823 SE2d 291) (2019) ("[J]urors are authorized to make such

7

reasonable inferences and reasonable deductions as ordinarily prudent persons would make in light of their everyday experience and knowledge of human conduct and behavior." (citation and punctuation omitted)). We thus conclude that the evidence was sufficient to support Kinlaw's conviction for aggravated stalking.

3. Kinlaw next challenges the trial court's refusal to provide an interpreter to facilitate Damaris's trial testimony. This claim fails.

The record shows that Damaris is a native Spanish speaker for whom English is a second language. At trial, early in the State's direct examination, Damaris indicated that she did not understand several questions, prompting the prosecutor to rephrase. Eventually,[5] Kinlaw's counsel interjected, and the following exchange took place during a bench conference:

> COUNSEL: Your Honor, this is, by my count, the fourth time—this is, by my count, the fourth time that the witness has indicated difficulty understanding the questions that were asked by the prosecuting attorney. This morning when we interviewed her at the District Attorney's Office she had two members of her family

---

[5] The record reflects that, at this point in the State's direct examination, the prosecutor had posed approximately one hundred questions to Damaris and that Damaris expressed difficulty understanding five of those questions.

interpreting for her. And I believe the January 7, January 9, and January 20 interviews, at least the January 7 and January 9 interviews, she also had an interpreter. If she needs an interpreter, then we need to get the interpreter now and not in the middle of the examination. And if she is having trouble following the direct, she is never going to follow the cross.

STATE: Is that an objection?

COUNSEL: I—I would ask that the Court qualify her understanding of the English language outside the presence of the jury, or just let's go ahead and get the interpreters.

STATE: I've talked to her for the last week, Judge. She understands me.

COURT: I don't see any need to do anything at this point. You've made your observation. I'm going to let the examination continue.

Before resuming questioning, the prosecutor asked Damaris to indicate if she could not understand a question, and Damaris agreed to do so.

Later, during cross-examination, Damaris sought clarification as to whether "fearful" meant "afraid." Another bench conference ensued during which Kinlaw's counsel again opined on the need for an interpreter, stating, "I'm going to renew the point we previously raised which is she is going to hide behind this language barrier every time she has an uncomfortable question, and that's why she

needs to have the interpreters here like she did all the times she was interviewed." The trial court again disagreed, explaining that "[t]here is no problem of any substance with her communication" but that "[t]here may be a problem of substance with the way you ask the questions when you use words like 'characterization' and stuff like that." Twice more during cross-examination when Damaris expressed confusion, the court summoned the parties to the bench and directed Kinlaw's counsel to use "plain English" and "the simplest of language" in questioning her.

On appeal, Kinlaw maintains that the trial court erred by refusing to provide an interpreter for Damaris.[6] We question whether trial counsel's requests for an interpreter constitute objections and whether the trial court's responses constitute rulings

---

[6] Kinlaw further asserts that the absence of an interpreter during Damaris's testimony violated his right to confrontation under the Sixth Amendment to the United States Constitution, and he also appears to challenge Damaris's competency as a witness. But Kinlaw did not object to Damaris's testimony on either basis in the trial court, so those claims are not preserved for appellate review. See *Blackshear v. State*, 285 Ga. 619, 621 (4) (680 SE2d 850) (2009). Because this case was tried in 2008 under Georgia's former Evidence Code, plain-error review of these evidentiary matters is not available. See *Lane v. State*, 312 Ga. 619, 622 (1) (864 SE2d 34) (2021).

such that this claim is preserved for appellate review. See *Ellis v. State*, 287 Ga. 170, 172 (2) (695 SE2d 35) (2010) ("It is the rule in Georgia that objections should be made with sufficient specificity for the trial court to identify the precise basis. It is not important in what format the allegation is cast so long as it is clear to the court the specific error alleged that the court may have the opportunity to correct [it]."). Assuming without deciding that this claim is preserved for our review, we conclude that it presents no cause for reversal.

"Interpreters are required to ensure meaningful access to our legal system by non-English speakers." *Gomez v. State*, 301 Ga. 445, 462 (11) (a) (801 SE2d 847) (2017). See also Supreme Court of Georgia's Rules for the Use of Interpreters for Non-English Speaking and Hearing Impaired Persons. We have recognized that the absence of a qualified interpreter for a criminal defendant who cannot effectively communicate in English may implicate constitutional concerns. See *Cisneros v. State*, 299 Ga. 841, 849-850 (3) (a) (792 SE2d 326) (2016); *Ling v. State*, 288 Ga. 299, 300-301 (1)

(702 SE2d 881) (2010) ("[F]ailure to provide adequate interpretation services to a defendant in criminal proceedings implicates due process concerns."). Here, Kinlaw's claim arises not from the trial court's refusal to provide an interpreter for Kinlaw himself, however, but from its refusal to provide an interpreter for Damaris, a witness for the State. In this context, we "review a [trial] court's determination as to the use of an interpreter for an abuse of discretion, which . . . amounts to an inquiry on whether the failure to provide an interpreter made the trial fundamentally unfair." (Citations and punctuation omitted.) See *United States v. Belfast*, 611 F3d 783, 821 (VI) (F) (11th Cir. 2010) (addressing claim arising from trial court's refusal to provide an interpreter to facilitate witness testimony). Cf. *Ling*, 288 Ga. at 300 (1). And in order to prevail on a claim arising from the lack of an interpreter, an appellant must demonstrate that he was actually harmed by the interpreter's absence. See *Gomez*, 301 Ga. at 463 (11) (a).

In rejecting this claim below, the trial court, after "thoroughly review[ing] the trial transcripts," found that, "[o]f the instances cited

by Kinlaw, very few definitively signal that Damaris did not understand the words used." The trial court further found that "Damaris never requested an interpreter for herself"; that, "when clarification was needed, she asked for it"; and that her "answers, on balance, were ultimately responsive to the questions asked." Finally, the trial court noted that Kinlaw "presented no evidence that Damaris's testimony was hampered by the lack of an interpreter or that she would have given different answers had one been secured." These factual determinations are supported by the record, and, as in the trial court, Kinlaw has neither identified any testimony he was unable to elicit from Damaris nor argued that his questioning of Damaris was limited in any respect due to the absence of an interpreter. Thus, on the record before us, we cannot say that the absence of an interpreter rendered Kinlaw's trial fundamentally unfair in violation of due process. See *Belfast*, 611 F3d at 821 (VI) (F) (no fundamental unfairness arising from absence of interpreter for witnesses who spoke "heavily-accented English" where record showed that, when testimony was difficult to understand, the trial

13

court interrupted the witness to ask for clarification and the witness in fact clarified his testimony). Cf. *Gomez*, 301 Ga. at 463 (11) (a) (no reversible error arising from trial court's failure to appoint separate interpreters for appellant and his co-defendant where appellant failed to show "that he was actually harmed by sharing an interpreter"); *Cisneros*, 299 Ga. at 850-851 (3) (a) (appellant failed to demonstrate that his trial was rendered fundamentally unfair by the flawed interpretation of Spanish-speaking witnesses' testimony where "none of the alleged errors prevented appellant from effectively presenting his defense" and there was "no instance where the meaning of a witness' testimony was altered in a legally significant manner"). See also *Davis v. State*, 292 Ga. 90, 92 (2) (734 SE2d 401) (2012) ("'In order to declare a denial of [due process,] a court must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'" (quoting *United States v. Valenzuela-Bernal*, 458 U. S. 858, 872 (III) (B) (102 SCt 3440, 73 LE2d 1193) (1982)). Accordingly, this claim fails.

4. Kinlaw next argues that the trial court erred by excluding evidence that Damaris told Kinlaw's mother that Herrera would "take care of" Kinlaw and that Kinlaw's mother conveyed this purported threat to Kinlaw. According to Kinlaw, this evidence was admissible to support his claims of voluntary manslaughter and self-defense. Kinlaw's trial, which occurred in 2008, is governed by our former Evidence Code. Under the former Evidence Code, "a murder victim's reputation for violence is irrelevant and inadmissible in criminal proceedings" but "may be offered as evidence by the accused upon the accused making a prima facie showing that the victim was the aggressor and was assaulting the accused, who was acting to defend himself." (Citations and punctuation omitted.) *Morris v. State*, 303 Ga. 192, 194 (II) (811 SE2d 321) (2018). The trial court found that Kinlaw failed to make such a prima facie showing, a decision we review for abuse of discretion. See *Tarpley v. State*, 298 Ga. 442, 444 (2) (782 SE2d 642) (2016).

There was no abuse of discretion here. The evidence recounted above clearly shows that Kinlaw, not Herrera, was the aggressor —

15

Kinlaw, in violation of a permanent restraining order, went to Damaris's home while armed with a handgun, secreted himself under a table, and, when his presence was revealed, aimed his weapon at Damaris and Herrera before ultimately shooting the unarmed Herrera, who was merely reaching toward Kinlaw's arm. See *Wainwright v. State*, 305 Ga. 63, 72 (5) (b) (828 SE2d 749) (2019) (a victim is not the aggressor when he is unarmed and is merely trying to disarm his assailant). The evidence thus supports the trial court's finding that Kinlaw failed to make a prima facie showing that Herrera was the aggressor. Accordingly, the trial court did not abuse its discretion by excluding evidence of Herrera's alleged threats. See *Tarpley*, 298 Ga. at 444 (2).

5. Kinlaw further complains that the trial court erred by refusing his requests to charge the jury on the defense of

justification[7] and on voluntary manslaughter[8] because, he says, there was slight evidence to support these charges.[9] To that end, Kinlaw points to evidence that Herrera attempted to disarm Kinlaw, which he argues authorized both jury charges. He also asserts that a voluntary manslaughter instruction was supported by evidence that Damaris was dating Herrera, which Kinlaw's trial counsel speculated could have incited Kinlaw's jealousy. The trial court was right to deny Kinlaw's requests.

As evidence that he was justified in shooting Herrera, Kinlaw cites testimony that Herrera reached toward the arm with which Kinlaw was holding the handgun just before Kinlaw shot Herrera. But as we have already discussed, the evidence shows that Kinlaw

---

[7] See OCGA § 16-3-21 (a) ("A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force[.]").

[8] See OCGA § 16-5-2 (a) ("A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person.").

[9] See, e.g., *Swanson v. State*, 306 Ga. 153, 155 (2) (829 SE2d 312) (2019) ("To authorize a jury instruction, there need only be slight evidence at trial supporting the theory of the charge.").

initiated the confrontation by pointing a handgun at Herrera and Damaris and that Herrera reached toward Kinlaw's gun only because Kinlaw was threatening him and Damaris. And there was no evidence that Herrera was armed or that he threatened Kinlaw in any way. Under these circumstances, the trial court correctly found that a justification defense was not supported by even slight evidence. See *Wainwright*, 305 Ga. at 72 (5) (b) (evidence that appellant shot victim when victim began to overpower appellant's accomplice did not support justification instruction because victim initiated physical struggle with accomplice only after appellant pointed a gun in victim's face while demanding that second victim empty his pockets); *Brunson v. State*, 293 Ga. 226, 227-228 (2) (744 SE2d 695) (2013) (no justification charge warranted where evidence showed that unarmed victim initiated struggle with appellant only after appellant threatened victim with a gun). See also OCGA § 16-3-21 (b) (1), (2) ("A person is not justified in using force . . . if he . . . [i]nitially provokes the use of force against himself with the intent to use such force as an excuse to inflict bodily harm upon the

18

assailant" or if he "[i]s attempting to commit, committing, or fleeing after the commission or attempted commission of a felony[.]"). "Indeed, it would turn the law on its head to allow an armed aggressor, who confronts an unarmed nonthreatening victim, to claim self-defense when the victim is shot during the victim's struggle to disarm the aggressor." (Citation and punctuation omitted.) *Wainwright*, 305 Ga. at 72 (5) (b).

A voluntary manslaughter instruction also was unwarranted. The fact that Herrera reached for Kinlaw's arm in an effort to disarm him in response to Kinlaw's pointing a gun at Herrera and Damaris shows, at most, that Herrera "physically resisted" Kinlaw's unlawful act, "which is not the type of provocation which demands a voluntary manslaughter charge." (Citation and punctuation omitted.) *Johnson v. State*, 313 Ga. 698, 700 (873 SE2d 123) (2022). Nor was Kinlaw entitled to a voluntary manslaughter instruction on the basis of adultery[10] or sexual jealousy. "[N]one of the parties were

---

[10] In his brief, Kinlaw mischaracterizes Damaris as his wife and argues that a "fresh disclosure" of her "infidelities" could warrant a conviction on the killing only for voluntary manslaughter.

19

married," so "no instruction regarding adultery as a provocation for voluntary manslaughter was warranted." *Tepanca v. State*, 297 Ga. 47, 49 (4) (771 SE2d 879) (2015). Likewise, the mere fact that Damaris, Kinlaw's former wife, was dating Herrera was not alone "sufficient to excite sudden, violent, and irresistible passion in a reasonable person." (Citation and punctuation omitted.) Id. at 50 (4). The trial court, therefore, did not err by refusing to charge the jury on either justification or voluntary manslaughter.

6. During jury selection, the trial court found that the State's peremptory strikes of two potential jurors, J. W. and I. B., who are both black, violated *Batson*, 476 U. S. at 89 (II) (B) ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race."). The trial court indicated that, to remedy the *Batson* violations, it would seat J. W., the first of the two potential jurors stricken by the State, and that the parties would redo the strike process beginning with the first potential juror after J. W. As to I. B., the trial court explained that "the reason offered for [striking] her is not a sufficient race neutral reason" and

20

indicated it would "let the State determine how . . . to proceed from there." Kinlaw did not object to this course of action. The trial court thereafter sat J. W. as a juror and the parties proceeded to restrike the jury as directed by the trial court. The State again struck I. B. After the jury was selected, defense counsel announced his satisfaction with its composition but then asserted that the State's restriking of I. B. "re-raises the *Batson* issue." The trial court inquired, "I thought you said you did not want to challenge it at this point. . . . I thought you just announced that." Counsel responded, "[W]e will stand by that announcement," and, when the trial court asked again if Kinlaw was satisfied with the jury's composition, counsel responded affirmatively.

Kinlaw now argues that the trial court erred both by implementing what he characterizes as an improper remedy and by permitting the State to restrike I. B. But Kinlaw failed to object to the trial court's remedial action and he acquiesced to the jury's composition before the jury was sworn. Thus, these issues are not

preserved for appellate review.[11] See *Howard v. State*, 288 Ga. 741, 746 (5) (707 SE2d 80) (2011); *Holmes v. State*, 273 Ga. 644, 645 (2) (543 SE2d 688) (2001).

*Judgment affirmed. All the Justices concur.*

Decided October 11, 2023.

Murder. Glynn Superior Court. Before Judge Guy.

*Singleton Trial Lawyers Group, Cara Clark*, for appellant.

*Keith Higgins, District Attorney, Benjamin E. Gephardt, Assistant District Attorney; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Emily R. Polk, Assistant Attorney General*, for appellee.

---

[11] We express no opinion regarding the propriety of the remedial action employed by the trial court.