NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the
# Supreme Court of Georgia

No. S26A0177
De'Monte Anderson
v.
The State

On Appeal from the Superior Court of DeKalb County
No. 20CR143810

Decided: June 2, 2026

LAND, Justice.

Appellant De'Monte Anderson challenges his 2022 convictions for malice murder and other crimes in connection with the shooting death of Dwayne Roberts.[1] Anderson argues that his

---

[1] Roberts was killed on October 20, 2019. On February 13, 2020, a DeKalb County grand jury indicted Anderson for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony in connection with Roberts's death, and for battery of his girlfriend, Destiny Head. On September 26, 2022, the trial court entered a nolle prosequi order for the battery count. At a trial from September 26 to 29, 2022, the jury found Anderson guilty of all remaining charges. The trial court sentenced Anderson to serve life in prison with the possibility of parole for malice murder and a consecutive term of 5 years in prison for possession of a firearm during the commission of a felony. The felony murder count was vacated by operation of law and the aggravated assault count merged with the malice murder count for sentencing purposes. On October 10, 2022, Anderson filed a motion for new trial, which was subsequently amended. The trial court held an evidentiary hearing on April 7, 2025, and entered a written order denying Anderson's motion for new trial on April 8, 2025. On May 2, 2025, Anderson filed a notice of appeal. The case was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

trial counsel rendered ineffective assistance by failing to object to two jury instructions. For the reasons that follow, we affirm.

1. The evidence presented at trial showed as follows. In October 2019, Anderson[2] and his girlfriend, Destiny Head, lived together in an apartment. On October 19, 2019, Head drove with her cousin and sister to a friend's house, purchased and drank some wine, dropped her cousin and friend back off at their respective homes, and then went alone to a party at different friend's house. While at the party, Head became intoxicated and passed out around 8:00 or 8:30 p.m. When Head woke up around 1:00 or 2:00 a.m., she saw that she had between 15 to 20 missed calls from Anderson, along with several angry text messages from Anderson. Head prepared to leave, but she learned that her car had been damaged, became upset, and got into a fight with a woman at the party and "messed up" her arm. Head then left the party and decided to go to the hospital for her arm injury. Head tried to call Anderson multiple times, but he did not answer, and she began to drive to the hospital. After Head stopped at a store and unsuccessfully tried calling Anderson again, she spoke with a ride-share driver, later identified as Roberts, who told her he would take her to the hospital. Roberts first followed Head to her apartment so that Head could tell Anderson where she was going.

When Head arrived at the apartment, she told Anderson about the fight. Head testified that Anderson "started fighting me for no reason," hitting Head in the face and pushing her to the ground. While Head began packing her stuff from the apartment and taking it to Roberts's car, Anderson spoke with Roberts and then confronted Head as to why Roberts would say "he was [her] man." Head told Anderson to leave Roberts alone and approached

---

[2] Head knew Anderson as "Money."

2

Roberts, who denied saying he "was [her] man." As Head walked back into the apartment to continue packing her things, she heard two gunshots, Roberts say, "this n***a is trying to kill me," and a third gunshot. When Head returned to the front of the building, she saw Anderson "leaning" into the open passenger-side window of Roberts's car and "tugging something." Head began to scream and Anderson hit her again. As Head attempted to help Roberts, who had fallen partway out of the vehicle, Anderson grabbed a bag, got in his truck, and drove away from the scene.

DeKalb County police responded to a call about a person shot and arrived at Head's apartment shortly after 5 a.m. The responding officer testified that, upon arriving at the scene, he found Roberts lying on the ground next to the driver's side of an SUV. Roberts was unresponsive, and the officer and emergency medical personnel attempted to render aid. Head told the officer that Anderson had shot Roberts and "struck" her. Investigators found blood on the driver's side door of the SUV, as well as .40 caliber Smith and Wesson cartridge casings in the passenger side seat and on the rear passenger floorboard.[3]

The medical examiner who performed an autopsy of Roberts's body testified that Roberts was shot four times: once in the right side of his chest, once in the right side of his back, once in his left hand, and once on his right thumb. The medical examiner also recovered a bullet from Roberts's left hand. The medical examiner determined that Roberts was shot from the passenger side of the vehicle and that "it [was] reasonable to believe" that Roberts was "either in a slumped over … or crouched position" when he was shot in the back. The medical examiner testified that the

---

[3] Investigators also found two 9 mm casings in the parking lot that were "worn and dull in appearance," indicating they were unrelated to Roberts's shooting.

range of fire for the wounds to Roberts's chest and back were indeterminate due to the lack of abrasion, soot, or stippling. Because the edges surrounding the wound to Roberts's right thumb were burned or seared, the medical examiner testified that Roberts's thumb was likely shot at close range. The medical examiner testified that the graze wound to Roberts's right thumb was "most indicative of a defensive-type wound" and that the injury to his left hand "could be" a defensive wound as well. The medical examiner testified that the cause of Roberts's death was multiple gunshot wounds, and the manner of death was a homicide.

A GBI firearms and tool marks examiner testified that the .40 caliber bullet recovered from Roberts's hand was consistent with being fired from a Glock .40 caliber pistol, Glock 10 mm pistol, Bersa HNK IMI Kahr arms, or Vector .40 caliber pistol. He also testified that the two .40 caliber casings recovered from Roberts's vehicle were fired from the same gun and consistent with having been fired from a Glock .40 pistol. The GBI examiner testified that if the shooter was standing outside Roberts's vehicle with his arm extended straight out while holding a pistol inside the window, he would expect to see cartridge casings inside the vehicle (as investigators did here), but if the shooter was standing outside the vehicle, with his hand also outside the vehicle, the examiner would expect to see cartridge casings outside the vehicle.

Police obtained a search warrant for Anderson's apartment, where they found two Smith and Wesson .40 caliber live rounds, which matched the caliber of shell casings found in the vehicle in which Roberts was shot.

Anderson's acquaintance, Daniel Schaefer, was with Anderson in the DeKalb County Jail in March 2020. Schaefer testified that a letter from Anderson was found by a sheriff's deputy

4

in his jail cell indicating that Anderson wanted Head "to be dead" by his court date.[4] Prior to trial, Anderson called Head multiple times from the DeKalb County Jail and asked her not to come to court. During the second call, in September 2020, Anderson told Head to say she was drunk and that Anderson was not the shooter.

Anderson testified in his own defense at trial that he asked Roberts to leave twice, but that Roberts refused to go anywhere "without [his] woman." Anderson testified that Roberts then "got … aggressive" and attempted to open the door to his SUV. Anderson then fired two shots at Roberts from outside the vehicle because he testified that he feared for his life. Anderson testified that he was not angry with Head but was instead confused. On cross-examination, Anderson conceded that he "did not know" if he saw Roberts with a gun and was unable to explain how the two spent shell casings ended up inside Roberts's vehicle. Anderson admitted that he threw his own gun out of the window of his vehicle as he drove away from the scene to his mother's house.

Prior to trial, Anderson's trial counsel filed a request for jury charges, including pattern charges on mutual combat (2.10.43), voluntary manslaughter (2.10.40), defense of habitation (2.10.80), affirmative defense (3.00.00), defense of self (3.10.10), forcible felony (3.10.11), reasonable beliefs (3.10.12), no duty to retreat (3.10.13), defense of home (3.12.10), and threats justifying a homicide (3.16.10). During the charge conference, trial counsel stated that he had "agreed to let in" the State's request for the pattern charge on words alone (2.10.42) and argued that, in this case, there was "words plus act and that gives you an inference of

---

[4] Anderson admitted during his trial testimony that he wrote the letter to Schaefer.

voluntary manslaughter."

During closing argument, trial counsel argued that Head was not credible, that Anderson acted in self-defense, and that Roberts's death was not malice murder, felony murder, or even manslaughter. The trial court instructed the jury as follows:

> In considering malice or felony murder charges you must decide whether the defendant was sufficiently provoked and acted out of passion. If you find this you may not return a verdict of guilty of malice or felony murder but you will be authorized to return a verdict of guilty of voluntary manslaughter. The State must prove beyond a reasonable doubt that the offense should not be reduced from murder to voluntary manslaughter.

> For voluntary manslaughter the State must prove that the defendant caused the death of another person under the circumstances that would otherwise be murder and acted only because of a sudden violent and irresistible passion that resulted from serious provocation which was sufficient to excite such passion in a reasonable person. If you decide that enough time passed between the provocation and the killing for a reasonable person to have cooled off and regained judgment then the killing is not voluntary manslaughter.

> Words alone, no matter how provoking, will never reduce the crime from murder to voluntary manslaughter. However, words coupled with menacing actions even if they do not amount to physical contact may be enough to excite a sudden violent and

6

irresistible passion in a reasonable person. If you find the defendant acted from such passion and not from malice [or] any spirit of revenge then you would be authorized to return a verdict of guilty of voluntary manslaughter.

During jury deliberations, the jury asked for a "legal definition of malice murder and voluntary manslaughter." The State requested the trial court instruct the jury again on malice murder, voluntary manslaughter, and provocation by words alone. Trial counsel agreed and asked the trial court to give pattern jury instructions on provocation by words alone (2.10.42), the lesser offense of murder: voluntary manslaughter (2.10.40), and voluntary manslaughter (2.10.41)again. The trial court instructed the jury as requested. Later during deliberations, the jury asked for the court to either read the entirety of the charges again slowly or to receive a copy of the charges. Over trial counsel's objection, the trial court provided the jury with a copy of the jury instructions. The jury found Anderson guilty of all charges.[5]

At the hearing on Anderson's motion for new trial, trial counsel testified that his defense strategy was to argue that Roberts's death was voluntary manslaughter, and this strategy influenced his "hard" cross-examination of Head, his closing argument, and his requested jury instructions. Trial counsel testified that he did not review the pattern jury instructions with Anderson and that he was "unaware if the burden ever shifted to the

---

[5] The verdict form offered the jury three options as to Count 1 (Malice Murder): "Not Guilty, Guilty, [or] Not Guilty of Malice Murder, but Guilty of the lesser included, Voluntary Manslaughter." The jury also had three options as to Count 2 (Felony Murder): "Not Guilty, Guilty, [or] Not Guilty of Felony Murder, but Guilty of the lesser included, Voluntary Manslaughter."

State" on voluntary manslaughter. When asked about the voluntary manslaughter charge, trial counsel testified that he did not consider objecting to the charge on the grounds that it prohibited the reduction of malice murder to voluntary manslaughter. Trial counsel testified that he thought Anderson had a "strong self-defense claim because [he] was at home," that in the alternative, Anderson had a strong voluntary manslaughter defense, and that the jury "was tied up" between malice murder and voluntary manslaughter.

2. Anderson argues that he received ineffective assistance of counsel in two respects. Both enumerations fail.

To establish a claim of ineffective assistance of counsel, a defendant must prove both deficient performance by his counsel and resulting prejudice. See *Strickland v. Washington*, 466 US 668, 687 (1984). To prove deficient performance, a defendant must show that his attorney performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687–88. The law recognizes a "strong presumption" that counsel performed reasonably, which the defendant bears the burden of overcoming. Id. at 689. And "decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course." *Wells v. State*, 295 Ga. 161, 164 (2014) (citation omitted).

Even when a defendant has proved that his counsel's performance was constitutionally deficient, the defendant also must prove resulting prejudice to prevail on a claim of ineffective assistance of counsel. *See Strickland*, 466 US at 694. To do so, the defendant must establish that but for his counsel's unprofessional errors, there is a "reasonable probability" that the outcome of the

8

proceeding would have been different. Id. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 US 86, 104 (2011) (quoting *Strickland*, 466 US at 693). Rather, the defendant must demonstrate a "reasonable probability" of a different result, which is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 US at 694. "If either *Strickland* prong is not met, this Court need not examine the other prong." *Palmer v. State*, 303 Ga. 810, 816 (2018). In all, the burden of proving a claim of ineffective assistance of counsel is a heavy one. See *Harrington*, 562 US at 105.

(a) Anderson argues that his trial counsel rendered ineffective assistance when he failed to object to the provocation by words alone jury instruction because that instruction prohibited a finding of voluntary manslaughter if the jury found the malice element of malice murder and therefore violated this Court's decision in *Edge v. State*, 261 Ga. 865 (1992).

This Court has previously held that

> When the evidence presented in a criminal trial warrants a jury instruction on a lesser-included offense, a trial court violates the rule against impermissible sequential jury instructions if it instructs the jury that it may consider the lesser offense only if it first unanimously finds the defendant not guilty of the indicted greater offense.

*Reese v. State*, 317 Ga. 189, 204 (2023) (cleaned up).

Here, Anderson's argument focuses on the following sentence of the jury instruction: "If you find the defendant acted from such passion and not from malice [or] any spirit of revenge then you would be authorized to return a verdict of guilty of voluntary

9

manslaughter." In Anderson's view, that instruction effectively told the jury that it could not even consider voluntary manslaughter unless and until it found him not guilty of malice murder. But the instruction had no such effect. Taken on its face, the instruction is most reasonably understood as directing the jury that it could find Anderson guilty of voluntary manslaughter if it found that he acted from "passion" and "not from malice." That decision for the jury — whether Anderson acted from passion or from malice — would naturally be a key part of the jury's deliberations as it decided whether he was guilty of either offense. The instruction allowed the jury to consider the two mental states together. It did not say that the jury first had to consider whether Anderson acted out of malice, and then, only if it found that he did not, it could consider whether he acted from passion. In other words, the instruction "did not expressly prohibit the jury from considering the lesser included offenses until after it reached a unanimous verdict on the indicted offenses." *Reese*, 317 Ga. at 205 (cleaned up). Accordingly, Anderson has not shown that an improper sequential charge was given in this case and any objection on that ground would have been meritless. See id. (trial counsel not deficient for failing to object to jury instruction on lesser-included offense of murder where objection would have been meritless). Because Anderson is unable to show deficient performance, this claim of ineffective assistance fails.

(b) Anderson argues that his counsel was ineffective in failing to object to a jury instruction that created a beyond a reasonable doubt standard for voluntary manslaughter's provocation element.

Anderson's argument focuses on the following jury instruction:

For voluntary manslaughter *the State must prove*

10

*that the defendant* caused the death of another person under the circumstances that would otherwise be murder and *acted only because of a sudden violent and irresistible passion that resulted from serious provocation* which was sufficient to excite such passion in a reasonable person. If you decide that enough time passed between the provocation and the killing for a reasonable person to have cooled off and regained judgment then the killing is not voluntary manslaughter.

(emphasis added). Anderson argues that because this pattern charge on voluntary manslaughter was not altered in accordance with the Council of Superior Court Judges of Georgia's "bench notes," the unaltered jury instruction makes it the State's burden to establish the elements of voluntary manslaughter, and specifically the State's burden to show beyond a reasonable doubt that the defendant acted only because of provocation. Anderson contends that his counsel should have objected to this charge and requested the alternative language suggested by the bench note.

The suggested pattern jury instructions for voluntary manslaughter (2.10.41) contain a "bench note" from the Council of Superior Court Judges of Georgia with the following suggestion: "Bench Notes: Where voluntary manslaughter is charged as a lesser-included offense of murder, consider modifying the first sentence to require that 'the evidence must prove' rather than 'the State must prove,' if evidence of passion/provocation has come from the defense." Neither Anderson nor the State requested any alteration to the pattern jury instruction to conform with this bench note. "[I]t is axiomatic that we do not assess jury charges in isolation; rather, we consider them as a whole to determine

11

whether there is a reasonable likelihood the jury improperly applied a challenged instruction." *Locklear v. State*, 317 Ga. 115, 122 (2023) (citation and punctuation omitted). It is also "axiomatic that the jury charge is to be read as a whole, and that a single [slip of the tongue], preceded and followed by correct instructions, will not vitiate a thorough and otherwise correct instruction." *Davenport v. State*, 283 Ga. 171, 173 (2008) (citation and punctuation omitted).

Here, even assuming that the unaltered pattern jury charge resulted in "inartful and potentially confusing" language by not replacing "the State must prove" with "the evidence must prove" and that trial counsel was deficient for failing to object to that language, the jury instructions, when read as a whole, were otherwise correct, and the inclusion of "the State must prove" language did not likely affect the jury's verdict. Accordingly, there is no prejudice resulting from counsel's failure to object. *Locklear*, 317 Ga. at 122 (appellant failed to show that the verdict form that included "the unnecessary insertion of the 'beyond a reasonable doubt' standard with respect to the presence of mitigating circumstances" likely affected the outcome of the proceedings "in light of the charges as a whole"). The record shows that, immediately prior to the challenged instruction, the trial court correctly gave a pattern jury instruction on voluntary manslaughter as an alternative to murder (2.10.40), and that the trial court also correctly charged the jury on the State's burden of proof, instructing the jury that "[t]here is no burden upon the defendant whatsoever and the burden never shifts to the defendant to introduce evidence or to prove innocence." Given the legal correctness of these charges, we are not persuaded that counsel's failure to object to the charge as given based on the suggestion of the bench note made the instructions misleading or otherwise affected the outcome of the proceedings. See *McNair v. State*, 296 Ga. 181, 185

12

(2014) (trial counsel's failure to object to charge on adultery as a potential provocation for voluntary manslaughter was not deficient or prejudicial because charges as a whole "did not mislead the jury … nor hinder the jury's ability to consider other mitigating factors in appellant's defense").[6]

Finally, although Anderson argues that this case is the "classic voluntary manslaughter case – catching your partner in the act of cheating with another," Anderson's own testimony undercuts that theory, as he testified that he was not angry with Head and instead shot Roberts because he feared for his life. Moreover, the "mere fact" that a romantic partner is allegedly cheating is "not alone sufficient to excite sudden, violent, and irresistible passion in a reasonable person," such that the evidence supporting Anderson's voluntary manslaughter theory was weak at best. See *Kinlaw v. State*, 317 Ga. 414, 423 (2023) (holding that defendant was not entitled to jury instruction on voluntary manslaughter on the basis of sexual jealousy based on the "mere fact" that defendant's former wife was dating the victim) (citation and punctuation omitted); *Tepanca v. State*, 297 Ga. 47, 50 (2015) (because defendant's "sexual jealousy was based wholly on supposition" that his affair partner "had gone out with" the victim, the evidence did not authorize a jury instruction on sexual jealousy as provocation for voluntary manslaughter). Because counsel's failure to object to the jury instructions on the basis of the sug-

---

[6] Anderson did not request a jury instruction on adultery as a potential provocation for voluntary manslaughter and would not have been entitled to such an instruction because he and Head were unmarried. See e.g., *Kinlaw v. State*, 317 Ga. 414, 423 (2023) ("None of the parties were married, so no instruction regarding adultery as a provocation for voluntary manslaughter was warranted." (cleaned up)).

gestion contained in the bench note did not likely affect the out-
come of these proceedings, this enumeration fails.

*Judgment affirmed. All the Justices concur, except Warren,
P.J., not participating.*